# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

PHYLLIS E. NORRIS,　　　　　　　　)
*Administratrix of the Estate of*　　)
*Chester Cecil Norris,*　　　　　　)　　Civil Action No.:  5:14-cv-00029
　　　　　　　　　　　　　　　　)
Plaintiff,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　By: Hon. Michael F. Urbanski
　　　　　　　　　　　　　　　　)　　　　United States District Judge
EXCEL INDUSTRIES, INC.,　　　　　)
　　　　　　　　　　　　　　　　)
Defendant.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)

## MEMORANDUM OPINION

This is a products liability action involving the rollover of a zero-turn radius lawnmower, which resulted in the death of the plaintiff's husband, Chester Cecil Norris ("Mr. Norris"). Before the court is defendant Excel Industries, Inc.'s ("Excel") Motion for Summary Judgment. ECF No. 147. The matter has been fully briefed, and the court heard oral argument on the motion on August 13, 2015. For the reasons set forth below, the court will **GRANT** Excel's motion.

### I.

On July 16, 2013, Mr. Norris was tragically killed while mowing grass in a subdivision in Winchester, Virginia when his mower slid down a wet embankment, struck a culvert, rolled over, and landed on top of him. The mower was a 2007 Hustler Z Model 927772A zero-turn radius mower manufactured by Excel. John Updike ("Updike"), the owner and operator of Evergreen Lawncare and Mr. Norris's employer, purchased the mower new in 2007 from Cutting Edge Small Engine Repair ("Cutting Edge"), a local landscaping equipment dealer in Winchester. The mower did not have a rollover protection system ("ROPS") which consists of a seatbelt and a roll bar extending over the driver's head.

In 2007, ROPS was not standard equipment on the Hustler Z, but rather was an option that a customer could purchase. Other mower models manufactured by Excel did feature ROPS as standard equipment. At that time, the American National Standard Institute ("ANSI") provided recommended standards and safety specifications for commercial turf care equipment such as the Hustler Z. The 2004 version of ANSI standard B71.4 applied when this mower was built and provided that certain stability tests, including a lateral upset test, should be performed on the mower to determine whether ROPS was necessary. The 2007 model of the Hustler Z met the requirements of ANSI standard B71.4. Thus, Excel did not make ROPS standard equipment for the Hustler Z, but instead provided ROPS as an optional safety package. ROPS became standard equipment on the Hustler Z in 2008.

Excel also provided an owner's manual for the Hustler Z that was given to Updike. As part of his duties as the owner of Evergreen Lawncare, Updike reviewed this owner's manual with Mr. Norris, including sections describing how to operate the Hustler Z on slopes and the need to avoid dangerous terrain. Updike provided additional safety instructions to all his employees about avoiding wet terrain when mowing.

Further, Mr. Norris was an experienced operator of the Hustler Z, having used that same mower multiple times while working with Evergreen Lawncare. Likewise, Mr. Norris had prior experience rolling over riding mowers. Mr. Norris suffered a closed head injury sometime in September 2012 when he accidentally rolled a mower. Though Mr. Norris apparently did not report this rollover to his employer, he did report to the emergency room at the Winchester Medical Center in Winchester, Virginia several weeks after the September accident to complain of head pain.

In her amended complaint, Phyllis Norris ("Norris") alleges Excel negligently designed, manufactured, and sold the mower without rollover protection or an adequate warning of the need for a safety frame system. Norris also seeks punitive damages because Excel's negligence was

2

willful, malicious, wanton, and reckless constituting a conscious disregard for the safety of consumers like the decedent.

Excel moves for summary judgment on the design defect claim on multiple grounds: (1) ROPS was offered as an option on the Hustler Z; (2) the lack of ROPS is open and obvious; (3) Norris assumed the risk by operating the lawnmower without ROPS; (4) offering ROPS as an option on the Hustler Z satisfied the relevant ANSI standard; and (5) Norris is pursuing a "crashworthiness" claim not recognized under Virginia law. As to the failure to warn claim, Excel moves for summary judgment because Updike and Mr. Norris were knowledgeable, experienced users of zero-turn radius mowers and well aware of the risks associated with their operation.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

3

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the Court must determine that no reasonable jury could find for the non[-]moving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

### III.

As a federal court sitting in diversity, the court must apply the substantive law and choice-of-law rules of the forum state. See Salve Regina Coll. v. Russell, 499 U.S. 225, 226 (1991) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). The accident occurred in Virginia, so Virginia products liability law applies. See Fry v. Commonwealth, 231 Va. 370, 376, 345 S.E.2d 267, 272 (1986).

4

## A. Products Liability Claim

In a products liability case, whether proceeding on an implied warranty or negligence theory of liability, the standard imposed on a manufacturer is essentially the same. Slone v. General Motors Corp., 249 Va. 520, 526, 457 S.E.2d 51, 54 (1995) (quoting Logan v. Montgomery Ward, 216 Va. 425, 428, 219 S.E.2d 685, 687 (1975)). Under either theory, the plaintiff must show that a product contained a defect that rendered it "unreasonably dangerous for the use to which it would ordinarily be put or for some other reasonably foreseeable purpose and that the unreasonably dangerous condition existed when the [product] left the seller's hands." Sutherlin v. Lowe's Home Centers, LLC, No. 3:14-CV-368, 2014 WL 7345893, at *8 (E.D. Va. Dec. 23, 2014) (citing Logan, 216 Va. at 428, 219 S.E.2d at 687). Manufacturers are not required to produce "accident-proof products," Slone, 249 Va. at 526, 457 S.E.2d at 54, or even "incorporate the best or most highly-advanced safety devices." Alevromagiros v. Hechinger Co., 993 F.2d 417, 420 (4th Cir. 1993) (citing Marshall v. H.K. Ferguson, 623 F.2d 882, 885 (4th Cir. 1980)). Thus, to determine if a product is unreasonably dangerous, a court "will consider safety standards promulgated by the government or the relevant industry, as well as the reasonable expectations of consumers." Alevromagiros, 993 F.2d at 420. A plaintiff cannot survive summary judgment unless she creates a genuine dispute of material fact that a product's design did not conform to (1) a government standard, (2) an industry standard, or (3) the reasonable expectations of consumers.

Excel moves for summary judgment on a number of grounds, including that the Hustler Z complied with the applicable ANSI standard and conformed to the safety expectations of reasonable consumers. In response, Norris argues that: (1) the ANSI standards applicable to lawnmower manufacturers are voluntary, industry-created standards; (2) the ANSI standards have been criticized by the Consumer Product Safety Commission ("CPSC"); (3) both the "design-safety hierarchy" and the Occupational Safety and Health Administration ("OSHA") standards require ROPS on zero-

turn radius mowers like the Hustler Z; (4) other lawnmower manufacturers were providing ROPS as standard equipment when this mower was sold; and (5) "optimistic bias" prevents consumers from seeing the need for ROPS. Each of these arguments will be considered in turn.

### 1. Government Standards

At oral argument, Norris's counsel claimed that OSHA standards require ROPS on zero-turn radius mowers. OSHA's regulations are codified in Title 29 of the Code of Federal Regulations. Two sections address the need for ROPS on tractors: 29 C.F.R. § 1926.1002 and 29 C.F.R. § 1928.51. Section 1926.1002 applies to "agricultural and industrial tractors used in construction work." 29 C.F.R. § 1926.1002(b). Under that section, an "agricultural tractor" is defined as "a wheel-type vehicle of more than 20 engine horsepower, used in construction work, that is designed to furnish the power to pull, propel, or drive implements." 29 C.F.R. § 1926.1002(j)(1). Industrial tractors are those machines "used in operations such as landscaping, construction services, loading, digging, grounds keeping, and highway maintenance." 29 C.F.R. § 1926.1002(j)(2). While the definition of "industrial tractors" includes those used for landscaping purposes, § 1926.1002 does not apply in this case because there is no dispute that the Hustler Z was not "used in construction work."

Section § 1928.51 is similarly inapplicable. This section requires ROPS for "tractors used in agricultural operations." 29 C.F.R. § 1928.51. An agricultural tractor is "designed to furnish the power to pull, carry, propel, or drive implements that are designed for agriculture. All self-propelled implements are excluded." 29 C.F.R. § 1928.51(a). There is no question that the Hustler Z at issue here was not designed to pull, carry, propel, or drive any agricultural implement, nor was it used in "agricultural operations." As such, this section of the C.F.R. also does not apply.

Even more fundamental, however, is the fact that the OSHA standards apply to employers with respect to their relationship with their employees, not the relationship between a manufacturer

6

and a consumer. The purpose of the OSHA standards is to ensure that an employer "furnish[es] to his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 C.F.R. § 1903.1; see also 29 U.S.C. § 651. "OSHA regulations are not relevant to the liability of a manufacturer to an employee of an industrial consumer." Davis v. Hebden, Schilbe & Smith, Inc., 52 F.3d 320, 1995 WL 231841, at *1 (4th Cir. 1995) (unpublished) (citing Minichello v. U.S. Industries, Inc., 756 F.2d 26, 29 (6th Cir. 1985)). Thus, the OSHA standards cited by Norris have zero bearing in this case, where the plaintiff is a consumer and the defendant is a manufacturer. As such, the court is unable to find any applicable government standard and concludes that there is no evidence Excel failed to comply with any government standard in the design of the Hustler Z.

### 2. Industry Standards

The parties identified two sets of industry standards that could apply to the Hustler Z: (1) ANSI standard B71.4 and (2) the "design safety hierarchy."

It is undisputed that the 2004 version of ANSI standard B71.4 governs the installation of ROPS on zero-turn radius mowers, including the Hustler Z. ANSI B71.4 requires that manufacturers perform certain stability tests to determine if ROPS is necessary. See Def.'s Mem. in Supp., ECF No. 149, at 5. Excel tested the Hustler Z mower in 2007, and the results indicated that the Hustler Z did not need ROPS in order to comply with the ANSI standard. Id. Even Norris's own expert, Dr. Jeffrey Ketchman ("Dr. Ketchman"), admits that the Hustler Z did not need ROPS to meet the requirements of ANSI B71.4. Ketchman Rep., ECF No. 176-3, at 18–19. Further, Excel's design actually exceeded the ANSI standard by making ROPS optional equipment a consumer could purchase and install on the Hustler Z. Id. at 18. Thus, the court finds no genuine dispute that the Hustler Z met the industry safety standard for ROPS.

7

Norris argues that the ANSI standards are merely recommendations, not true industry standards. The court disagrees. The ANSI standards are exactly the type of formally promulgated industry standards referenced in Alevromagiros and Sexton. See Alevromagiros, 993 F.2d at 419 (noting that ANSI standards are "advisory industry standards."); Sexton, 926 F.2d at 333 (citing ANSI standards for protective headgear). Both the Virginia Supreme Court and various federal courts have cited ANSI standards as authoritative safety standards across a range of industries and products. See Heer v. Costco Wholesale Corp., 589 F. App'x 854, 862 (10th Cir. 2014) (step stools); Sappington v. Skyjack, Inc., 512 F.3d 440, 451 (8th Cir. 2008) (scissor lifts); Holmes v. Wing Enters., Inc., No. 1:08-CV-822, 2009 WL 1809985, at *5 (E.D. Va. June 23, 2009) (ladders); Edwards v. ATRO SpA, 891 F. Supp. 1074, 1081 (E.D.N.C. 1995) supplemented, 891 F. Supp. 1085 (E.D.N.C. 1995) (nail guns); Harris v. T.I., Inc., 243 Va. 63, 67, 413 S.E.2d 605, 607 (1992) (truck warning signals).

Norris further argues that the ANSI standards for riding mowers "have been criticized by the Consumer Product Safety Commission ("CPSC") as not in comportment with operating conditions for riding mowers as to its stability recommendations." Pl.'s Mot. in Opp'n, ECF No. 169, at 21. However, the CPSC report critical of the ANSI standard—only part of which is attached as an exhibit to an affidavit of one of Norris's expert witnesses—was written in 1984, twenty years before ANSI adopted the version of B71.4 that applies in this case. ECF No. 169-4, at 188–89. Moreover, the CPSC's only apparent criticism is that "the correlation between the stability related requirements in the [1984 ANSI] standard and actual mower stability during slope operation has not been demonstrated." Id. at 189. Such criticism has zero bearing on a standard promulgated and adopted twenty years later.

Norris also claims that Excel did not conform to another ANSI standard applicable here—the "design safety hierarchy." According to Norris's expert, Dr. Ketchman,[1] the design safety hierarchy:

> dictates that manufacturers and designers proactively seek out hazards associated with use, or foreseeable misuse, of the product, and:
> 1. Eliminate hazards so identified by design, if this is technologically and economically feasible.
> 2. For hazards that cannot be eliminated by design, provide physical means of reducing the potential or severity of injury (such as guarding, or automobile air-bags for example.)
> 3. Lastly, provide proper warnings, instructions and possibly specialized training, identifying the hazard and its means of avoidance. (If 2. is necessary 3. will be also used.)

Ketchman Rep., ECF No. 176-3, at 8–9. According to Dr. Ketchman, "the Design Safety Hierarchy essentially mandates that [the mower] always be equipped with ROPS—which is to be used whenever possible." Id. at 9.

As an initial matter, the court is not convinced that ANSI has adopted the design safety hierarchy as a standard, much less as a standard applicable to zero-turn radius mowers. While Norris claims that ANSI adopted the design safety hierarchy by virtue of a technical report released in 2000, that report refers to risks associated with the manufacturing of machine tools. ECF No. 169-4, at 265. Machine tools, of course, are not lawnmowers, and are covered by a separate set of ANSI standards for machine tool safety. See ANSI standard B11. Norris provides absolutely no evidence that the design safety hierarchy has been adopted as a standard for commercial turf equipment like the Hustler Z.

In addition, Dr. Ketchman provides no explanation as to why the design safety hierarchy mandates ROPS on the Hustler Z. As explained by the 2000 ANSI report for machine tool safety standards, the design safety hierarchy is a process akin to the scientific method, and Dr. Ketchman

_____

[1] Excel has moved to exclude the expert testimony of Dr. Ketchman. ECF No. 145.

9

admits as much by referring to it as a "standard of care," a "standard of practice," and a "standard that professional engineers . . . adhere to." Ketchman Dep., ECF No. 176-1, 306:12–22. However, Dr. Ketchman offers no evidence to show that he actually performed a "risk assessment and risk reduction" analysis as described in the 2000 ANSI report. See ECF No. 169-4, at 271–91. Further, even if Dr. Ketchman had applied the hierarchy in this case, he provides no explanation as to how his application of the hierarchy leads him to conclude that ROPS is mandatory equipment for the Hustler Z, other than his opinion that a warning is simply not good enough. See Ketchman Rep., ECF No. 176-3, at 9; Ketchman Dep., ECF No. 176-1, 306:2–307:22.

The core of Dr. Ketchman's opinion is exactly the type of evidence rejected by the Fourth Circuit in Alevromagiros. It is an attempt by an expert witness to insert his "own subjective opinion" as to the defective design of a product when that product undisputedly complies with the relevant industry standard. Alevromagiros, 993 F.2d at 421. Dr. Ketchman's view that ROPS is mandatory on the Hustler Z is based on an untested and unsubstantiated theory of what the law should be—that the manufacturer should provide an accident-proof product—in direct contravention to the actual law of the Commonwealth of Virginia.

"The court is constrained to rely on the opinion testimony of experts to ascertain the applicable safety standard" only where there is an absence of "'an established norm in the industry.'" Id. (quoting Ford Motor Co. v. Bartholomew, 224 Va. 421, 430, 297 S.E.2d 675, 679 (1982)). This is not such a case. ANSI standard B71.4 provides the established standard for requiring ROPS on commercial turf care equipment, not Dr. Ketchman's subjective view of what would make for a safer product. While Dr. Ketchman's opinion may be relevant with regard to consumer

10

expectations, there is no dispute that Excel complied with the applicable industry standard in its design of the Hustler Z.[2]

### 3. Consumer Expectations

As there is no proof that the design of the Hustler Z failed to meet government or industry standards, the sole remaining issue is whether Norris offers any evidence that reasonable consumers expected the Hustler Z to have ROPS. Such evidence can include "actual industry practices, knowledge at the time of other injuries, knowledge of dangers, the existence of published literature, and from direct evidence of what reasonable purchasers considered defective at the time." Hambrick ex rel. Hambrick v. Ken-Bar Mfg. Co., 422 F. Supp. 2d 627, 634 (W.D. Va. 2002) (citing Sexton v. Bell Helmets, 926 F.2d 331, 337 (4th Cir. 1991)). Norris offers two arguments on consumer expectations.

First, Norris directs the court to the practice of other manufacturers at the time Excel designed the Hustler Z. Norris's expert, Dr. Ketchman, claims that the actual industry practice in 2007 was to make ROPS standard on zero-turn radius mowers because twelve manufacturers, including Excel, made ROPS standard equipment on certain models of their mowers. Ketchman Aff., ECF No. 169-4, at 3. In his original report, Dr. Ketchman claims that six manufacturers, including Excel, included ROPS as standard equipment on certain mower models prior to 2007. See Ketchman Rep., ECF No. 176-3, at 10–11. In a supplemental affidavit attached to Norris's brief in opposition to summary judgment, Dr. Ketchman increases this claim to twelve manufacturers who provided ROPS as standard equipment on some models of their mowers.[3] Ketchman Aff., ECF No. 169-4, at 3. Dr. Ketchman provides no citation for the allegation in his affidavit, but the court

---

[2] Norris relies on Doe v. American National Red Cross, 848 F. Supp. 1228 (S.D. W.Va. 1994), for the proposition that compliance with industry standards cannot conclusively establish the absence of negligence. To be sure, mere compliance with an industry standard does not exonerate manufacturers because "[c]ustomary practice does not prescribe the duty of care." Id. at 1233. But a plaintiff in a products liability case must have some proof that a product is unreasonably dangerous, measured by a government standard, an industry standard, or reasonable consumer expectations. Here, Norris has no such proof.

[3] Excel has moved to strike Dr. Ketchman's affidavit. ECF No. 178.

11

assumes this information comes from plaintiff's exhibit 6022, ECF No. 204-1, which Excel has moved to exclude. ECF No. 192. The court cannot conclude, however, that Dr. Ketchman or this unauthenticated exhibit 6022 present evidence that Excel disregarded actual industry practice in 2007 when it decided to provide ROPS as optional equipment on the Hustler Z.

At the outset, the origins of exhibit 6022 are unclear. Norris claims that the exhibit is a compilation of information taken from sales and marketing material from Excel and eleven other manufacturers. See Pl.'s Mem. in Opp'n, ECF No. 199, at 3–4. However, neither Dr. Ketchman nor Norris provide any information about the author of the exhibit. The exhibit is titled "Manufacturers That Put Standard ROPS On Any Riding Mower In 2005 Or Before," suggesting that it includes data only on ROPS-equipped mowers manufactured prior to 2005, which is two years before Excel manufactured the Hustler Z. See ECF No. 204-1. However, the exhibit also states that it was revised on June 15, 2015. Id. No notation is made to identify what changes, if any, were made when the document was revised, or who made the changes.

Further, during his rebuttal deposition, Dr. Ketchman admitted that he did not independently verify the information in exhibit 6022 for purposes of this case. Ketchman Rebuttal Dep., ECF No. 199-2, at 66:10–67:7. Dr. Ketchman did state that he had cross-referenced the relevant marketing and sales material with exhibit 6022 at some time prior to his work in this case. Id. at 67:8–12. However, it is unclear if Dr. Ketchman ever reviewed the updated version of exhibit 6022 that was revised on June 15, 2015.

Notwithstanding questions about the validity of the information in Dr. Ketchman's affidavit and in exhibit 6022, the court finds that this data does not create a genuine dispute as to whether Excel ignored industry practice in 2007 when it manufactured the Hustler Z without ROPS. While Dr. Ketchman claims that twelve manufacturers provided ROPS as standard equipment on some mowers, he identifies neither the total number of manufacturers of zero-turn radius mowers in 2007,

12

nor the total percentage of mowers comparable to the Hustler Z that included ROPS as standard equipment. Even Norris's counsel admits that manufacturers provided ROPS on certain models of mowers, but provided no ROPS on other models. In fact, Excel is named as one of the twelve manufacturers in exhibit 6022 because Excel provided ROPS as standard equipment on at least two of its other mower models. Furthermore, the models listed in exhibit 6022 have varying weights and heights that distinguish them from Excel's Hustler Z, and no information is given about the time periods during which each manufacturer sold the various ROPS-equipped mowers listed. Absent additional information, vague assertions that Excel and eleven other manufacturers provided ROPS as standard equipment on some models of their mowers, but then also provided no ROPS on other models, cannot raise a genuine dispute that it was industry practice in 2007 to provide ROPS as standard equipment on zero-turn radius mowers like the Hustler Z, much less that Excel violated this industry practice when it chose to provide ROPS as optional equipment.

Second, Norris offers evidence of "optimistic bias" to prove that consumers underestimate the likelihood of harm from rollovers. As explained by another expert witness, Dr. Dale Griffin ("Dr. Griffin"), optimistic bias is "the set of psychological tendencies that jointly operate to lead individuals to underestimate the likelihood of future negative outcomes and overestimate the likelihood of future positive outcomes."[4] Griffin Rep., ECF No. 137-5, at 1. In the context of zero-turn radius mowers, Dr. Griffin opines that optimistic bias explains why consumers are willing to use mowers without adequate protective structures like ROPS. Id. at 5. In his view, purchasers are "unlikely to vividly imagine" the risk of rollover accidents, and thus are "unlikely to worry enough about the consequences to seek action." Id. Absent a "concerted persuasive effort" by

---

[4] The parties have filed multiple, identical copies of Dr. Griffin's report, but many of these copies do not include the addendum describing the methodology used in Dr. Griffin's consumer surveys. The court thus cites to the full version of the report that is attached to Excel's motion to exclude Dr. Griffin, ECF No. 137. This copy includes Dr. Griffin's complete report, including the addendum describing his survey methodology, and is otherwise identical to the copies of the report attached to various other pleadings in this case.

13

manufacturers to make consumers aware of the risk of rollovers, Dr. Griffin believes that consumers "would not even consider the possibility of rollover accidents altogether, or conclude that 'it won't happen to me.'" Id.

To test the effect of optimistic bias in the context of zero-turn radius mowers, Dr. Griffin conducted two online surveys about consumer behavior in the purchase and use of riding lawnmowers. The results showed that a "statistically significant majority" of respondents believed that they or their employees were less likely to be involved in a rollover accident and were more likely to be in control of their driving than the average buyer of riding lawnmowers. Id. at 7. Based on these results, Dr. Griffin concludes that consumers are unlikely to "consider and plan for the risk of a serious rollover accident prior to purchasing a ride-on lawnmower." Id. at 12.

Norris argues that Dr. Griffin's report shows that the risk of rollovers was dangerous beyond the expectations of an ordinary consumer. To support this claim, Norris cites Excel's own sales data. Prior to the time Excel made ROPS standard equipment on its commercial mowers, it offered ROPS as an optional attachment. Steinert Dep., ECF No. 169-7, at 117:11–120:14. Yet, only 1% to 3% of customers purchased the optional ROPS package during this time period. See id.; see also Pl.'s Mem. in Opp'n, ECF No. 169, at 10. Norris claims that this evidence supports Dr. Griffin's theory of optimistic bias among consumers of the Hustler Z. Norris argues that a great majority of consumers chose not to buy ROPS because they were not sufficiently aware of the danger of rollovers, but had they been so aware, they would have purchased ROPS.

At the outset, the court notes that Excel raises multiple concerns about the reliability of Dr. Griffin's report, including the methodology used to conduct his online surveys. See Def.'s Mot. to Exclude, ECF No. 137. Even ignoring these concerns, the court finds that Dr. Griffin's report creates no genuine dispute as to whether reasonable consumers would expect the Hustler Z to have

ROPS. In fact, despite Norris's claims to the contrary, the evidence proffered by Dr. Griffin actually shows that consumers did not expect or want ROPS on the Hustler Z.

For example, Excel's sales data from 2001 to 2006 shows that the overwhelming majority of consumers—between 97% to 99%—chose to purchase a zero-turn radius mower without adding the optional ROPS package. Thus, almost all consumers chose to operate their mowers without ROPS. This data supports Excel's own argument that it conformed to consumer expectations when it chose not to offer ROPS as standard equipment on the Hustler Z. The sales data certainly does not show—even when construed in the light most favorable to Norris—that consumers demanded or expected ROPS. When consumers are offered an optional safety feature, and nearly 99% of those consumers decline that option, the logical conclusion is that the average, reasonable consumer did not demand or expect the additional protection that feature provided.

The consumer surveys conducted by Dr. Griffin do nothing to dispel this conclusion. These surveys focused on whether consumers expected to get into an accident while operating a mower, not what safety features they expected on those mowers. To be sure, the surveys did include several questions about a respondent's willingness to pay more money for an optional ROPS feature. See Griffin Rep., ECF No. 137-5, at 18. However, these questions did not ask whether a reasonable consumer would expect the Hustler Z to have ROPS. Instead, Dr. Griffin used these questions to develop an overall conclusion about the "comparative optimism" of the respondents. Id. at 24. Respondents were never asked about their expectation for ROPS as standard equipment. As such, Dr. Griffin's surveys offer no insight into whether consumers reasonably expected ROPS on the Hustler Z.

Norris seeks a final refuge in Dr. Griffin's theory of "optimistic bias." Under that theory, the key issue is a consumer's inability to appreciate the hazards of a rollover. Because this optimistic bias leads consumers to underestimate the risks associated with rollovers, few consumers

believe a ROPS is needed as standard equipment. Norris thus asks this court to ignore the actual expectations of consumers, since those expectations are influenced by optimistic bias. Instead, Norris seeks to substitute a new consumer standard that requires ROPS as standard equipment on all zero-turn radius mowers. The court declines to adopt this approach for several reasons.

First, Virginia law does not support Norris's theory of "optimistic bias." It is well accepted that a manufacturer is "not required to supply an accident-proof product." Slone, 249 Va. at 526, 457 S.E.2d at 54. Yet Norris would effectively require Excel to do just that. She argues that, because consumers are optimistic (and thus naïve), they cannot appreciate the danger of rollovers. Excel is thus obliged to provide a product that protects consumers from the harms they cannot fully appreciate. This is simply another way of saying that Excel has an obligation to make their products injury-proof—even if consumers do not expect or demand an injury-proof product—because Excel must account for the optimism that taints a consumer's ability to appreciate the risk of harm. That is not the law.

Second, Dr. Griffin's theory of optimistic bias conflicts with precedent from Alevromagiros and Sexton. Under these cases, a plaintiff must offer "direct evidence" that consumers "reasonably expected a higher level of protection than that called for by the existing government and industry standards," Sexton, 926 F.2d at 337, or "direct evidence of what reasonable purchasers considered defective." Alevromagiros, 993 F.2d at 420–21. The theory of optimistic bias is no replacement for direct evidence that consumers reasonably expected ROPS on their zero-turn radius mowers. Norris offers no such direct evidence. Thus, she cannot create a genuine dispute of material fact that Excel failed to meet reasonable consumer expectations when it manufactured the Hustler Z without rollover protection.

In the end, the evidence proffered by Norris and her experts, even when construed in the light most favorable to her, cannot show that consumers reasonably expected a higher level of

16

rollover protection than that called for by government or industry standards. Since Norris offers no evidence sufficient to show that Excel's design of the Hustler Z failed to conform to (1) a government standard, (2) an industry standard, or (3) the reasonable expectations of consumers, she cannot establish a prima facie case for defective design under Virginia law. Excel is thus entitled to summary judgment on Norris's products liability claim.[5]

### B. Failure to Warn Claim

Norris also alleges that Excel was negligent in failing to provide adequate warning of the need for ROPS. Under Virginia law, a manufacturer can be liable for a negligent failure to warn where it:

> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Besser Co. v. Hansen, 243 Va. 267, 277, 415 S.E.2d 138, 144 (1992) (quoting Restatement (Second) of Torts § 388 (1965)). In its motion for summary judgment, Excel does not contest any of these three elements. Instead, Excel raises two defenses to the failure to warn claim. First, Excel argues that the hazard of a rollover was open and obvious to both Mr. Norris and Updike, his employer.[6] Excel further argues that Norris and Updike were knowledgeable, experienced users of zero-turn radius mowers and well aware of the risks associated with commercial mowing. In response, Norris argues that the specific hazards of a rollover were not open and obvious on the day of the accident.

---

[5] Excel offered several alternative arguments for summary judgment on Norris's design defect claim, including that the absence of ROPS was "open and obvious." As the court notes in Part III.B of this opinion, the hazards associated with the lack of ROPS on the Hustler Z were open and obvious to Mr. Norris. Under Virginia law, the open and obvious defense applies to both a design defect and failure to warn claim. See, e.g., Austin v. Clark Equip. Co., 821 F. Supp. 1130, 1133 (W.D. Va. 1993) ("[T]he Fourth Circuit has held that a manufacturer is not liable for defective design and the failure to warn where the hazard is open and obvious."), aff'd, 48 F.3d 833 (4th Cir. 1995). Thus, the open and obvious hazard associated with the lack of ROPS can also serve as an alternate ground for summary judgment on Norris's design defect claim.

[6] Excel and Norris discuss the open and obvious defense in the context of Norris's defective design claim. Since the defense is equally applicable to a failure to warn claim, the court adopts those arguments here.

She also argues that there is a genuine dispute as to whether Excel relied on Mr. Norris's and Updike's knowledge of the dangers of rollovers. Because the court finds Excel's arguments on the open and obvious defense persuasive, it will address only that defense below.

Under Virginia law, a manufacturer "is not liable for failing to warn of an 'open and obvious' defect." Austin v. Clark Equip. Co., 48 F.3d 833, 836 (4th Cir. 1995) (citing Spangler v. Kraco, Inc., 481 F.2d 373, 375 (4th Cir. 1973)). "A risk is open and obvious if the person using the product is or should be aware of the risk." Id. This standard is an objective one, inquiring whether a plaintiff knew, or should have known, of the relevant hazard. See id.; see also Patrick v. Klaisler Mfg. Corp., No. 93-0054-D, 1995 U.S. Dist. LEXIS 7276, at *9 (W.D. Va. Apr. 12, 1995). Some courts discuss the issue of an open and obvious hazard in terms of a defense to a failure to warn claim, see Patrick, 1995 U.S. Dist. LEXIS 7276, at *12–14, while others discuss the issue in terms of proximate cause. Butler v. Navistar Intern. Corp., 809 F. Supp. 1202, 1208–09 (W.D. Va. 1991). All courts, however, recognize that the "relevant question under Virginia law is not whether the defect itself . . . was obvious, but whether the hazard . . . [associated with that defect] was open and obvious." Freeman v. Case Corp., 118 F.3d 1011, 1014–15 (4th Cir. 1997). The question of whether a hazard is obvious is often one of fact, see Morgen Indus., Inc. v. Vaughan, 252 Va. 60, 66, 471 S.E.2d 489, 492–93 (1996), but summary judgment is appropriate where a "reasonable jury could reach only one conclusion." Austin, 48 F.3d at 836.

In this case, the only "defect" alleged in the Hustler Z is the absence of ROPS. The hazard associated with this "defect" is the risk that the mower could roll over and cause serious injury or death. Thus, the two critical questions are whether Mr. Norris (1) knew or should have known that he was operating a Hustler Z without ROPS and (2) knew or should have know about the risk his mower could roll over and injure him. See Butler, 809 F. Supp. at 1208. Based on the record before it, the court concludes that there is no genuine dispute on either question.

18

First, the uncontested evidence shows that Mr. Norris should have known that he was operating a Hustler Z that lacked ROPS. In his deposition testimony, Updike noted that the mower Mr. Norris used on the day of his death was the mower Mr. Norris "operated day in and day out, and that was his primary mower." Updike Dep., ECF No. 149-7, 181:8–11. Updike further noted that Mr. Norris had "used [that mower] for years" and had operated it "between three and four thousand" hours. Id. at 181:10-14. The ROPS in this case consists of a seatbelt and a roll bar extending over the driver's head. As one court has noted, "the lack of ROPS is something which is readily revealed by merely looking" at a machine. See Butler, 809 F. Supp. at 1208. These items are so conspicuous that their absence would be obvious to anyone who operated this specific mower, especially someone who had operated it for thousands of hours over many years.

Further, it is undisputed that Mr. Norris had experience operating other mowers equipped with ROPS. In the years prior to the accident, Mr. Norris operated an International tractor with both a seatbelt and rollover bar that extended above the driver's shoulders. See J. Norris Dep., ECF No. 149-16, at 32:19–33:8. Similarly, Mr. Norris used other mowers at Evergreen Lawncare that had roll bars, including one ROPS-equipped mower that Mr. Norris used on the same slope where the accident later occurred. Updike Dep., ECF No. 149-7, 101:4–22; 115:4 –118:7. This prior experience with ROPS-equipped mowers only reinforces the finding that Mr. Norris should have known that his Hustler Z mower did not have ROPS. Because of Mr. Norris's long experience with this Hustler Z, his prior exposure to ROPS, and the generally obvious nature of an overhead bar and seatbelt, a reasonable juror could reach no other conclusion but that Norris knew or should have known that his mower lacked rollover protection.

Similarly, there is no genuine dispute that Mr. Norris knew or should have known about the risk a mower could roll over and injure its operator. Applying West Virginia law, the Fourth Circuit has suggested that the hazards associated with the absence of ROPS are objectively knowable merely

19

because rollover protection is not present.  See Higgins v. American Honda Motor Co., 974 F.2d 1331, 1992 WL 212147, at *4 (4th Cir. 1992) (unpublished).  In Higgins, the court analogized the lack of ROPS protection on an all-terrain vehicle ("ATV") to the lack of protection on motorcycles, noting that "the lack of safety features on motorcycles and the incident risk of bodily harm [are] patent beyond cavil."  Id. (internal quotations omitted).  The court concluded that the lack of ROPS on an ATV—as well as the resulting hazards associated with not having ROPS—were so obvious as to require summary judgment for the defendant on the plaintiff's product liability claim.  Id.  Other courts have reached similar conclusions when ROPS is not included on tractors.  See Hambrick ex rel. Hambrick v. Ken-Bar Mfg. Co., 422 F. Supp. 2d 627, 637 (W.D. Va. 2002) (holding that the risk of puncture from an exposed bolt on a go-cart is not "near as obvious as the risk of injury posed by rollover of an open-mount motorcycle, ATV, or tractor."); Winn ex rel. Winn v. Pollard, 62 S.W.3d 611, 618 (Mo. Ct. App. 2001) (finding no duty to warn "because the absence of a ROPS is an open and obvious condition" on a farm tractor); Caterpillar, Inc. v. Shears, 911 S.W.2d 379, 383 (Tex. 1995) ("As a matter of law, Caterpillar and B.D. Holt did not have the duty to warn of the dangers of operating the loader as an open cab without a ROPS . . . [because the] average person would recognize that operating an industrial vehicle with open sides and top presents a degree of risk of serious harm to the operator."); Allen v. W.A. Virnau & Sons, Inc., 28 S.W.3d 226, 234–35 (Tex. App. 2000) (finding that the defendant had "no duty to warn a person experienced with tractors, and with this tractor, in particular, of the open and obvious risk of falling off or being thrown from a tractor that had no seat belt or ROPS."); see also Delvaux v. Ford Motor Co., 764 F.2d 469, 474 (7th Cir. 1985) (finding that a convertible's lack of a roof is "obvious" such that a plaintiff could not recover for injuries sustained in a rollover accident).

 To be sure, none of the cases cited above deal specifically with the hazards associated with the rollover of a zero-turn radius mower.  However, these cases stand for a general principle that the

hazards associated with the absence of ROPS can be open and obvious merely because the absence of ROPS is so apparent that users should know that certain injuries are possible. In this way, there is little distinction between a user's knowledge of the "defect" and the user's knowledge of the hazard that results from that defect. Applying this principle to the case at hand, Mr. Norris's experience with ROPS-equipped mowers and his actual knowledge that the Hustler Z lacked ROPS would be sufficient to find that he knew or should have known that there was a risk his Hustler Z would roll over and trap him beneath it. While the court recognizes that the Hustler Z is a low-slung mower that is not identical in appearance to the ATV in Higgins, the go-cart in Hambrick, or the commercial tractors in Pollard, Shears, and Allen, it finds that the absence of ROPS—and the hazards associated with the lack of rollover protection—are as obvious on the open-bodied Hustler Z as they are on an ATV or tractor.

Norris cites two cases in an attempt to distinguish her case. First, Norris notes that the court in Hambrick denied summary judgment because it found a genuine dispute of fact as to whether a go-cart's lack of ROPS was open and obvious. 422 F. Supp. 2d at 637. In that case, however, the cockpit of the go-cart was surrounded by a "tubular construction" that resembled a roll cage. Id. The court held that a jury must decide if the tubular construction was so similar to a ROPS that the plaintiff could reasonably believe it would afford protection during a rollover. Id. No such ROPS-like structure was present on the Hustler Z, which makes the reasoning from Hambrick cited by Norris inapplicable here.

Norris's reliance on Freeman v. Case Corp., 118 F.3d 1011 (4th Cir. 1997), is similarly unavailing. In Freeman, the Fourth Circuit reversed a district court who found in favor of a manufacturer on grounds of an open and obvious hazard. Id. at 1013. The alleged defect in Freeman involved the faulty placement of a brake pedal and speed ratio control pedal on a Case International tractor. Id. The district court ruled that the arrangement of the two pedals was open

21

and obvious as a matter of law. Id. at 1014. The Fourth Circuit reversed, finding that the district court erred in focusing on whether the alleged defect was open and obvious, rather than whether the hazard associated with that defect was open and obvious. Id. The Fourth Circuit ruled that the hazard associated with the pedal arrangement—namely, the risk that a driver would press both pedals, causing the tractor to lurch unexpectedly—was not clearly apparent and remanded the case for further consideration.

Freeman is distinguishable on its facts. In that case, the defect involved a pedal arrangement that led an operator to accidently press both pedals at once, resulting in the unexpected movement of a tractor. The hazard of an unexpected lurch is not so intertwined with a defective pedal arrangement that users can identify the hazard by merely looking at the pedals. In contrast, the absence of ROPS on a mower makes plain the risk of serious injury should the mower roll over on its operator. While Freeman affirms that some hazards will not be open and obvious simply because the alleged defect is apparent, it does not disturb the general principle from Higgins that the hazards associated with the absence of ROPS can be obvious merely because the absence of ROPS is so apparent that a user should know that injuries are likely in the event of a rollover.

The court does not rest its holding on general principles alone, however. There is significant, uncontested evidence that Mr. Norris was otherwise aware of the rollover hazards associated with riding mowers. First, Mr. Norris had previously suffered head injuries after rolling a lawnmower only ten months prior to his death. On September 17, 2012, Mr. Norris presented to the emergency room at the Winchester Medical Center in Winchester, Virginia. See Winchester Emergency Dep't Report, ECF No. 149-19, at 1. Mr. Norris was seen by Dr. Charles Turnbull ("Dr. Turnbull"), the attending physician in the Winchester Emergency Department. Id. Mr. Norris told Dr. Turnbull that he had "rolled my lawnmower over last week" and complained of severe headaches, "floaters," and "butterflies." Id. While the medical records show that Mr. Norris did

22

not remember details of the incident, Dr. Turnball testified at his deposition that he recalls Mr.

Norris stating that "there was a slope, a grade, when he [Norris] rolled this over." Turnbull Dep.,

ECF No. 149-18, 11:15–20. Dr. Turnball requested a CT scan of Mr. Norris's head, proscribed

Tylenol and Ultracet for pain relief, and ordered him to return if his headaches or "butterflies"

persisted. See Winchester Emergency Dep't Report, ECF No. 149-19, at 1. There is no evidence

that Mr. Norris reported this injury to his employer or to his family.

Further, Updike discussed safety precautions with Mr. Norris and his fellow employees.

During his deposition, Updike noted that he told his employees to not mow on wet terrain because

"mowers slip on the wet grass." Updike Dep., ECF No. 149-7, 54:8–15. He also did not allow

employees to mow steep slopes with riding mowers, and instead used push-mowers or weed eaters

on steeper terrain. Id. at 55:1–6. Updike further stated that his "major rule was you need to be

safe," and that "if it looks dangerous, don't do it." Id. at 54:8–56:3.

Updike also discussed safety concerns specific to the Hustler Z. As part of his training of

employees at Evergreen Lawncare, Updike reviewed the Hustler Z's owner's manual with Mr.

Norris. Id. at 184:11–187:22. Relevant sections of the manual state:

> **Slope Operation**: Slopes are a major factor in loss-of-control and
> tip-over accidents, which can result in severe injury or death. All
> slopes require extra caution. If you cannot back up the slope or if
> you feel uneasy on it, do not mow it. REMINDER: Only operate on
> slopes of 15 degrees or less.
>
> Use extreme caution when operating on slopes. Be extremely careful
> changing directions on a slope. Slow down. Do not operate where
> the machine could slip or tip. Turn slowly. Turn on the most level
> part of the slope. To maximize traction, it is better to turn the front
> of the machine uphill, rather than downhill. If drive tires lose
> traction, steering control is lost which could cause serious injury or
> death. . . . .
>
> . . . Avoid starting and stopping on a slope. If tires lose traction,
> disengage the blades and proceed slowly straight down the slope.
> Mow a safe distance (minimum of 10 feet) away from drop-offs,
> retaining walls, drainage ditches, embankments, water, and other

23

> types of hazards to avoid a wheel dropping over the edge or to avoid
> the ground from breaking away. This will reduce the risk of the
> machine suddenly rolling over causing serious injury or death.
>
> . . . When operating on terrain where there is a potential for roll
> over, it is important that a ROPS be installed on the equipment. The
> ROPS will minimize chance of injury or death from rollover. Seat
> belt must be fastened while operating a machine equipped with
> ROPS. Failure to use seat belt will result in serious injury in the
> event of a roll over.

Hustler Z Owner's Manual, ECF No. 149-12, at 9–10. It is unclear if Updike reviewed the section of the manual dealing specifically with ROPS with Mr. Norris, see Updike Dep., ECF No. 149-7, at 198:7–199:13, but Updike recalls reviewing other relevant sections of the manual with Mr. Norris and/or instructing him on safety procedures in a way consistent with the safety guidelines provided in the manual. Id. at 184:4–188:4; 198:7–199:13. As seen above, these guidelines describe the dangers of rollover accidents on slopes, including the importance of maintaining traction and the need for caution when mowing near embankments.

This uncontested evidence is significant proof that the hazards associated with rollovers were open and obvious to Mr. Norris. He received multiple instructions about the safety precautions he should take when mowing on slopes, on wet grass, and when near an embankment.[7] He was also an experienced user of the Hustler Z, and received safety instructions specific to the tip-over dangers associated with that mower. Most importantly, Mr. Norris rolled a mower a mere ten months before his death, and suffered injuries serious enough to require medical attention at an

---

[7] There is also evidence Mr. Norris refused to mow certain areas because he did not "feel comfortable" mowing them. Updike Dep., ECF No. 149-7, 56:10–13. This includes several instances where Mr. Norris stated that he was not comfortable mowing a hill or a slope, because "he just didn't feel that he could operate the mower safely on that particular place." Id. at 57:13–58:4. The court agrees that this might be further evidence that Mr. Norris was actually aware of the hazards associated with rollovers on mowers without ROPS. However, there is conflicting evidence about why Mr. Norris felt uncomfortable mowing certain slopes. Updike stated that Mr. Norris never said "I think I'm going to flip the mower," and instead suggested that Mr. Norris was more concerned that an uncontrolled slide would cause property damage to a customer's yard. Id. at 59:1–60:12. This conflicting testimony presents a dispute of fact as to whether Mr. Norris's prior refusal to mow certain slopes shows that he was actually aware of the hazards associated with rollovers. Because there is other, undisputed evidence that Mr. Norris understood the hazard associated with rollovers, the court need not rely on this testimony.

emergency room.  This evidence is so powerful that a reasonable juror could only conclude that Mr. Norris knew, or should have known, about the risks associated with the rollover of a Hustler Z without ROPS protection.  See Austin, 48 F.3d at 836–37 (affirming summary judgment on grounds of an open and obvious hazard where the plaintiff and her employer were aware that the defendant's product lacked certain safety devices, the employer had developed policies to address the absence of such safety devices, and the plaintiff had been trained to abide by the policies); see also Belcher v. J.H. Fletcher & Co., 54 F.3d 772, 1995 WL 300030, at *2 (4th Cir. 1995) (unpublished) (affirming summary judgment for a manufacturer on grounds of an open and obvious defect where the plaintiff had twelve years of experience in the coal industry and had worked both with and without the safety canopies at issue in the case).  Because the court finds that reasonable minds could not differ as to whether the specific hazards associated with the absence of ROPS were open and obvious to Mr. Norris, Excel is entitled to summary judgment on Norris's failure to warn claim.

**IV.**

For the reasons stated above, the court will **GRANT** Excel's motion for summary judgment, ECF No. 147, and **DISMISS** this case.  An appropriate Order will be entered this day.

The Clerk is directed to send copies of this Memorandum Opinion to counsel of record.

Entered:  October 19, 2015

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

25